JOHN A. BARRI *vs.* THE SCHWARZ BROS. COMPANY
ET ALS.

Third Judicial District, Bridgeport, April Term, 1919.

PRENTICE, C. J., RORABACK, WHEELER, BEACH and GAGER, Js.

The title to unreclaimed mud flats and land under water, and to riparian rights therein, may be tried and determined under § 5113 of the General Statutes, which provides that any person claiming title to or interest in property may sue anyone claiming an interest in it adversely to the former.

Riparian rights—which constitute a species of property in the nature of a franchise—have their origin or source in the ownership of upland adjoining the water, and are an incident of such ownership. They may, however, be separated and conveyed apart from the upland to which they naturally appertain, like any other property-right or franchise, if the owner so desires.

A conveyance of upland bordering upon tide water, presumptively includes the riparian rights which are naturally attached to the land conveyed, including those of reclamation and wharfing out to the channel. But this presumption is rebuttable, and if the grantor's intent to confine his grant to the upland, or to reserve some portion of the riparian rights attached thereto, is apparent from his deed when read in the light of the surrounding circumstances—as in the present case,—effect will be given to that intent and the operation of the deed limited accordingly.

A map duly certified and filed in the town clerk's office, showing the location and dimensions of numbered lots plotted thereon, which is referred to in deeds of the lots to different grantees, is thereby incorporated in the several deeds, and the identifying or explanatory features of the map are thus entitled to consideration in the construction or interpretation of the deeds.

The right to reclaim mud flats does not pass under a deed of upland, if it appears from the map incorporated in the deed that outside of and beyond the lines of those lots another tier of lots covering more or less of the mud flats was surveyed and plotted. Under such circumstances the intent of the grantor is clearly indicated to confine the grant within the lines of the plotted lots of upland, and to reserve all estate or franchise rights in the mud flats lying outside of those lines.

In the present case the lines of two lots, numbered 91 and 92 upon the map, extended beyond the shore and included mud flats as well as upland. *Held* that the plotting of these lots as shown upon the map, and the conveyance made in accord therewith, were exceptional in their character and indicated a controlling purpose of the grantor, apparent also to the grantees, to restrict the operation of the grant to the lines shown upon the map.

Lines and figures upon a map showing the location and dimensions of lots plotted thereon, are not courses and distances, but partake rather of the character of boundaries.

Of two apparently or possibly conflicting descriptions in a deed, the one containing the less certainty must yield to that possessing the greater,—in the present case to the greater certainty to be found in the details of the map than in the description used in the deeds.

The situation of the property and the surrounding circumstances, including the use of the water by the grantor for a tidal mill, are to to be regarded in trying to ascertain the intent which actuated the use of any indefinite language in the conveyance of the property.

Argued April 10th—decided June 11th, 1919.

SUIT to determine the rights of the respective parties in and to certain mud flats and to quiet and settle the

title thereto, brought to and tried by the Superior Court in Fairfield County, *Warner, J.;* facts found and judgment rendered in favor of the plaintiff, from which some of the defendants appealed. *No error.*

Andrew L. Winton was in 1872 the owner of a considerable tract of land situated in Bridgeport and lying on the westerly side of a body of water known as the Berkshire Mill Pond. This so-called pond is formed by the combined action of the waters of the Pequonnock River and the tides. The channel of the river extends down through the pond to the harbor and Sound, and the rising tides cause its waters and those of the harbor to set back in such manner as to form a body of water overflowing a considerable area. This condition of high water was, and since 1872 has been, maintained by Winton and his successors in title by the erection of a dam located upon the down-stream portion of the land, and as thus maintained utilized in the operation of a mill also located upon the land.

In 1872 Winton caused a considerable portion of his land to be surveyed, plotted into lots and mapped. The map which was the outcome of this work, duly certified, was filed in the land records of Bridgeport during that year.

Winton died in 1892 without having sold any of the property thus surveyed and charted. In 1895 the executors of his will caused to be made and filed another map, practically identical with the 1872 map in so far as it related to the same territory, but which covered slightly less.

Both maps show a highway called River Street extending along the westerly side of the pond and touching it in spots. The shore line of the pond is irregular and the distance of River Street from it is, therefore, varying. Along the easterly or water side of this street are plotted a continuous series of lots numbered from

65 to 92 inclusive. These lots are marked as fifty feet wide in front and one hundred feet deep. The shore line, which is delineated on the maps, is in some places substantially coincident with the easterly line of the street, and in others distant from it nearly three hundred feet. This is the situation opposite to lots No. 84 to No. 92. All of these lots, save only No. 84 and No. 92, have upland extending to and beyond some portion of their rear limits. No. 90 comprises upland entirely. No. 84 and No. 92 have no upland on the side toward the water, and the remaining lots are part upland and part flats on that side. In the rear of No. 85 and No. 86 the upland extends back to approximately three hundred feet from the street. The larger part of No. 92 is below high-water mark, and its rear is entirely so. From that lot to the tidal dam below is a little more than one hundred feet.

Outside of this River Street tier of lots, and adjoining it, is laid out a second tier lying for the most part entirely beyond the shore line, but in six instances not reaching it. These lots do not extend far enough to the south to cover the rears of No. 91 and No. 92, and terminate at the northerly end at an indicated street called Evergreen Street. On the opposite side of this street, which is laid out at right angles with River Street, are plotted other lots. A long line of them fronts on River Street. Three of them, to wit, No. 62, No. 63 and No. 64, face on Evergreen Street. These three are located upon a point of land which extends out from the line of River Street some three hundred feet and is approximately three hundred feet in width on its extreme water-front. The four most northerly of the second tier of lots above described are also located upon this point, but have some one hundred feet of unplotted upland between them and the water. No. 64 is the farthest out of the three lots, and, fronting on Ever-

green Street, has its easterly side toward the channel. This easterly boundary as the lot is delineated is substantially in a line with the shore line of the promontory of which it takes in a part. Thus placed it projects out in the direction of the channel farther, by its entire width, than any other lot upon the map. The major portion of it consists of flats, and on the channel side embraces no upland.

All the lots upon the 1872 map have their superficial area noted thereon. This feature is omitted from that of 1895.

In September, 1895, the executors of Winton's will made a deed, covering, among other lots, No. 84 to No. 92 inclusive, to the defendant Edward Schrieber, who, or his successors in title, also defendants, now own them. In this deed the property conveyed is described by boundaries, one of which is upon the mill pond, and by the further statement that it consisted of specified numbered lots upon the map of 1872 filed in the town clerk's office. By deed of December 3d, 1895, the executors conveyed to E. W. and Rebecca Thornton lots No. 62, No. 63 and No. 64, using a similar description save that the map reference was to that of 1895. A deed from the executors to the plaintiff of the Winton property not already conveyed to others, followed later in December, 1895.

Other facts are sufficiently stated in the opinion.

*John C. Chamberlain*, for the appellants (certain defendants).

*William B. Boardman*, for the appellee (plaintiff).

PRENTICE, C. J. The appealing defendants, as the owners of eight lots, to wit, No. 64, No. 84, No. 85, No. 87, No. 89, No. 90, No. 91 and No. 92, and a part

of No. 88, claim to be entitled to the enjoyment of riparian rights originally incident to the ownership of the upland lying within their limits. The plaintiff, as successor in title to Winton, disputes this claim, asserts that he is entitled to that enjoyment, and asks that the two conflicting claims be adjudicated and the rights of the parties be judicially established. Certain of the defendants are also owners of lots No. 62 and No. 63, but before us disclaimed as to those lots.

The defendants' first contention is that this action, brought under Chapter 174 of the Public Acts of 1915, now appearing as § 5113 of the Revision of 1918, is not maintainable under its provisions, since title to its subject-matter, to wit, unreclaimed lands under water and rights therein, cannot from its very nature be in the plaintiff but rests in the public. The statute, as it read when the action was brought and as it has since remained, runs in favor of any person claiming either title to or interest in property against any person claiming to have an interest in it adverse to him. It is true that the matter in contention between the parties here is confined to the enjoyment of riparian rights, but these rights have their source in property ownership and exist only as an original incident of such ownership. They are in the nature of a franchise, constitute a species of property and are separable from and alienable as thus separated in the same manner as other property. *Simons* v. *French*, 25 Conn. 346, 353; *Farist Steel Co.* v. *Bridgeport*, 60 Conn. 278, 283, 22 Atl. 561. They clearly constitute interests in property.

Their second and major contention is that they, and not the plaintiff, are entitled to enjoy the rights in question.

The plaintiff and defendants derive their respective titles from a common source. They are all grantees of the legal representatives of one Winton, who, in 1872,

and down to his death in 1892, was the owner of what is now theirs and its adjoining upland, together with the riparian rights attached thereto as upland bordering upon Berkshire Mill Pond, a body of water formed by the joint action of the tides and the flow of the Pequonnock River. These riparian rights, although originating in and derived from the ownership of upland adjoining the pond, were, as we have seen, separable from such ownership and independently alienable by the owner at his pleasure like any other property or franchise he possessed. A conveyance by him, or his legal representative after his death, of portions of the tract bordering upon the pond would presumptively carry with the respective pieces the riparian rights attached thereto, including those of reclamation and wharfing out to the river channel. *Watson* v. *Peters*, 26 Mich. 508, 517; *Gilbert* v. *Emerson*, 55 Minn. 254, 261, 56 N. W. 818; 1 Jones on Real Property in Conveyancing, § 477; 3 Farnham on Waters & Water Rights, § 723.

Such presumption, however, is a rebuttable one, and if the grantor's intent to confine his grant to the upland, or to reserve some portion of the riparian rights attached thereto, is apparent from his deed when read in the light of the attending and surrounding circumstances, effect will, as in other cases, be given to that intent, and the operation of the deed limited accordingly. *Hatch* v. *Dwight*, 17 Mass. 289, 295; *People ex rel.* v. *Board of Supervisors*, 125 Ill. 9, 23, 17 N. E. 147; *Duke of Devonshire* v. *Pattinson*, L. R. 20 Q. B. Div. 263; 3 Farnham on Waters & Water Rights, § 723.

The deeds under which the several defendants hold antedate that to the plaintiff. An inquiry, therefore, as to what passed to the defendants or their predecessors in title by the deeds to them, when read and interpreted in accordance with their manifest intention, will determine the extent of the defendants' rights and

interest here in controversy, and incidentally determine also the respective rights and interests of the parties litigant in the subject of the litigation.

The deeds, which the executors of Winton's will gave to the appealing defendants or those under whom they hold, described and identified the property conveyed not only by a general description stating one boundary as being on the pond, but also by reference to lot numbers as they appeared upon maps on file in the town clerk's office. These references to maps have the effect of incorporating them in the deeds referring thereto. General Statutes, § 319. The identifying or explanatory features contained in them are as much a part of the deeds, and so entitled to consideration in their interpretation, as though they were expressly recited therein. *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178, 194, 10 Sup. Ct. 518; *Boston Water Power Co.* v. *Boston*, 127 Mass. 374, 376.

The contention of the parties in so far as it relates to the River Street lots, with the exception of No. 91 and No. 92, is easily resolved by simple reference to the fact that the map incorporated in the deed of them by Winton's executors shows that outside of and adjacent to them is surveyed and plotted another tier of lots. Here is found ample indication, not otherwise in any way rebutted, that the grantors' intention was to restrict their conveyance of property or franchise within the limits of the plotted lots and to reserve all estate or rights in the flats outside of those limits. *Gilbert* v. *Emerson*, 55 Minn. 254, 261, 56 N. W. 818; *Bradshaw* v. *Duluth Imperial Mill Co.*, 52 Minn. 59, 63, 53 N. W. 1066; 1 Jones on Real Property in Conveyancing, § 478. The reasons for this conclusion are well stated in the above cited cases, and are so obvious that their restatement is unnecessary.

Lots No. 91 and No. 92 are not subject to the applica-

tion of this rule of construction, as no plotted lots are shown between them and the channel. A provision contained in the deed of Winton's executors that lots numbered from 84 to 90 inclusive, may be filled in to the pond one hundred feet from the northerly line of River Street and that no other land covered by the deed shall be so filled in beyond the shore of the pond is, however, effective to deprive the owners of lots No. 91 and No. 92 of the right of reclamation not only beyond the plotted rear lines thereof, but also beyond the shore line. As this express prohibition may not be sufficiently comprehensive to accomplish a reservation of all riparian rights, including that of wharfing out, we are compelled to look elsewhere to discover an intent on the part of the grantors to make such reservation, if such intent there was.

As the rear of No. 91 does not in its north half reach the shore line, the defendant owners can, of course, have no riparian rights attached to that portion of the lot. If they have rights of that character, they can be only such as originally attached to the upland frontage lying within the boundaries of the two lots, that is, within No. 92 and the southern portion of No. 91.

A most significant feature as bearing upon the defendants' claim in this regard is that the 1872 map referred to in the deed of these lots shows that they are plotted as extending beyond the shore line and including flats as well as upland. They are not marked out as bounded either upon the pond so-called or any line coincident with its shore line. Nor is it a merely accidental circumstance that the survey and plotting carry the lots beyond the shore. The map bears upon its face the line of the shore and locates it well within the lot's boundaries. The natural and normal description for the grantors to have employed, if they had intended to grant the upland within the plotted lots together with

the riparian rights attached thereto, would have been to have bounded the upland upon the pond. That the lots were plotted as they were and the conveyance made according to the plotting, are facts most persuasive that there was a controlling purpose, apparent to the grantees, behind the exceptional course pursued, and that that purpose was to restrict the operation of the conveyance to the lines shown.

Counsel for the defendants in this connection urges that the deed contains a description of the property conveyed which bounded it upon the pond, and that this description should prevail over what he chooses to call the courses and distances appearing upon the maps. That appeal to an artificial rule of construction overlooks the fact that the lines and figures shown upon the maps, in so far as they possess present importance, are not courses and distances within the meaning of the rule invoked but partake rather of the character of boundaries. The figures showing the length of side lines serve the purpose of locating the rear boundaries in the absence of other monuments or available identifying means. The situation presented is one where two descriptions are given which, upon their face at least, appear to be in conflict, or in possible conflict. The rule in such cases is that the one containing the less certainty must yield to that possessing the greater, if apparent conflict between the two cannot be reconciled. *Pinney* v. *Winsted*, 79 Conn. 606, 612–614, 66 Atl. 337. Applying this rule to the situation in hand, it becomes apparent that greater certainty is found in the details of the map than in the deed description. In fact the map, with its delineation of lots, both interior and exterior, with their measured boundary lines and stated areas, leave small room for doubt that the grantors' intention was to describe the property conveyed as shown thereon, that is to say, as having their

rear boundaries not at the shore line but out on the flats.

But the considerations above noted as indicating the grantors' intention to restrict their grant of riparian rights within the limits of the lots as delineated on the map are not the only ones of similar import. The carefully detailed features of the map make an unusually clear revelation of the grantors' plan and scheme for the development of this water front property, and is eloquent of a purpose to separate the River Street tier lots, at least, from any riparian rights beyond them and to convey them, if conveyed they should be, as complete and independent entities.

We are entitled also to look at the situation of the property and the surrounding circumstances, in an effort to ascertain the intent which actuated the use of any indefinite language in the conveyance of it. *Sweeney* v. *Landers, Frary & Clark*, 80 Conn. 575, 578, 69 Atl. 566; *Bartholomew* v. *Muzzy*, 61 Conn. 387, 393, 23 Atl. 604. Winton was, and the plaintiff, his successor in title has been, utilizing the so-called pond through the employment of a tidal dam for the storage of water for beneficial use in the operation of a mill. This dam is but a short distance from and below these two lots. The layout which Winton made plainly indicates not only that he regarded it unwise to dispose of lots nearer to his dam than those plotted, but also that the possibility of a nearer approach to either the dam or channel of structures than the lot limits permitted was a thing, in prudence at least, to be avoided.

In view of these considerations, we are of the opinion that the intention of Winton's executors to reserve the riparian rights attached to the upland within lots No. 91 and No. 92 is sufficiently apparent to be controlling in the construction and operation of their deed of these properties. A quite similar situation was presented in

*Simons* v. *French*, 25 Conn. 346, and a similar conclusion reached for similar reasons.

Lot No. 64, although several hundred feet distant from lots No. 91 and No. 92, presents many features in common with them. It is embraced in the same layout, and is located just across an indicated street from the northerly lots of the two tiers hereinbefore referred to. One of its sides faces the channel, but being located upon the farthest point of an upland projection in the channel's direction, it lies farther out by its entire width than any other plotted lot. At the same time its location is such that the reclamation of the flats within it, which comprise its major part and its entire water front, would serve only to widen a little the small promontory of which its upland forms a part, and carry the line of that upland a little farther northerly in a substantially straight line. The map shows that a strip of upland along the whole present frontage of the promontory is unplotted and manifestly intended to be reserved from sale. It is only after the shore line has made a turn inland and is started on its way diagonally across the lot that the upland is reached which is embraced in it. The same general line of reasoning applicable to lots No. 91 and No. 92, which need not be elaborated, leads us to the conclusion that the grantors' intent in making the deed of lot No. 64, as shown in it and the surrounding circumstances, was to confine the property and rights conveyed to those lying within the limits indicated by the plotted lines of the map.

There is no error.

In this opinion the other judges concurred.